**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| Michelle S. ) | |
| ) | |
|     *Plaintiff*, ) | |
| ) | Case No. 17 CV 50397 |
| v. ) | |
| ) | Magistrate Judge Lisa A. Jensen |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
|     *Defendant*. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle S. brings this action under 42 U.S.C. § 405(g) challenging the denial of disability benefits. For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded.

**I. Procedural History**

Plaintiff filed her application on March 30, 2014 alleging disability beginning March 10, 2013. R. 20. Plaintiff's application was denied initially and upon reconsideration. *Id.* Plaintiff appeared and testified at a hearing held on October 20, 2016. R. 39. Also appearing and testifying were James McKenna, M.D. an impartial medical expert and Glee Ann Kehr, an impartial vocational expert. Plaintiff's husband also testified. *Id.*

On January 12, 2017 the ALJ issued her written report denying Plaintiff's claims for disability benefits. R. 20-33. In evaluating Plaintiff's claim, the ALJ used the Social Security Administration's five-step sequential evaluation process. *See* 20 C.F.R. 404.1520(a). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 10, 2013, the alleged onset date of her disability. R. 22. At step two, the ALJ determined that

Plaintiff had the following severe impairments: psychogenetic episodes (rule/out conversion disorder), dependent Personality Disorder, anxiety disorder, rule out schizotypal personality disorder, headaches and obesity. R. 22. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1420(d), 404.1525 and 404.1526). R. 23. Instead, the ALJ proceeded with the analysis by evaluating Plaintiff's RFC, meaning her ability to perform physical and mental work activities despite her impairments. 20 CFR 404.1545(a)(1). The ALJ determined that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except Plaintiff could not climb ladders, ropes or scaffolds, work at unprotected heights, work around hazardous machinery or perform commercial driving. R. 26. Plaintiff was limited to simple and routine work with no interaction with the public as part of routine job duties and only occasional interaction with coworkers and supervisors, Plaintiff should avoid all work that involved fast-paced assembly line duties or jobs where the machine is setting the pace but can perform work at a variable rate. *Id.* Plaintiff was limited to only occasional decision making or occasional changes to the work setting. *Id.* At step four, the ALJ determined that Plaintiff did not have the RFC to perform the work activities of her prior employment. R. 31. Finally, at step five the ALJ determined that there exist significant numbers of jobs in the national economy that the Plaintiff could perform. R. 32.

## II. Facts

Plaintiff testified at her hearing that she had been experiencing seizure like spells for approximately four years. R. 57. She described these spells as starting with pressure building in her head. *Id.* She would lose time and had, on different occasions, been found lying on the floor or in a bathtub. *Id.* Her family told her that the spells lasted a few seconds to one to two minutes.

R. 57-58.  After the spells subsided she felt tired and her whole body felt sore.  R. 58.  She explained that she has cracked about seven teeth due to clenching her jaw during the spells.  *Id.*  She also experienced physical shaking during the spells.  *Id.*  Plaintiff stated that the spells got worse over time but at the time of the hearing the frequency was steady at about two spells per month.  R. 57.

Plaintiff also testified to her daily migraines.  She stated that since the migraines started she was in pain every day.  R. 58.  Normally the pain level was about five on a one to ten scale.  *Id.*  However, at times the pain reached a ten and she would need to be in a dark room with no lights or sound.  *Id.*  She has tried multiple medications and a nerve block, but the pain doesn't really change.  R. 59.  She did not think stress was affecting her headaches because the headaches persisted even after she stopped working.  *Id.*  She takes many medications and they give her alternating constipation and diarrhea as well as fatigue.  *Id.*

Plaintiff stated that on "really bad days" she does not want to get out of bed. R. 60.  She is unable to do anything with her kids.  *Id.*  She has been diagnosed with leukocytosis that results in shooting pain down her arms and into her thumb.  R. 61.  Her left foot also goes numb and she starts shaking.  *Id.*  She is only able to stand for about one to two hours at a time.  *Id.*  She has problems lifting and she gets light headed when she does.  *Id.*

Plaintiff testified that she sees Dr. Dulli for her headaches approximately every three months.  R. 62.  At the time of her disability hearing, that treatment relationship was ongoing.  *Id.*

Plaintiff's husband testified that he had last observed his wife have a seizure approximately two weeks prior to the hearing date.  R. 63.  He observed her whole body shaking.  *Id.*  This lasted quite a few minutes.  *Id.*  During this episode she was nonresponsive.  *Id.*  Generally during her seizures, she shakes and clenches her jaw.  *Id.*  He has observed that after these seizures she is

unconscious unless he rubs her chest with his knuckles. *Id.* She can be out for a couple of hours. *Id.* He recalled a time when he came home and found Plaintiff unconscious on the floor in the kitchen. *Id.* He also recalled a time when he found her unconscious in the bathtub. R. 63-64.

The severity of the seizures varies. R. 65. About once a week he has observed Plaintiff zone out where she does not respond unless he shakes her to get her to snap out of it. *Id.* The other more severe episodes where she is shaking and clenching her jaw occur at least once a month. R 65-66. Usually after an episode she is sore and stiff for a couple of days. *Id.*

An independent medical expert, Dr. McKenna, also testified at the hearing. He had not examined Plaintiff, but rather had reviewed her medical records. R. 42-43. Dr. McKenna, a board-certified Internist with a subspecialty in pulmonary medicine, opined that Plaintiff had "psychogenic episodes, which are not seizure in nature and they appear to be stress related." R. 43, 731. He also said that Plaintiff had "what's described as a headache." R. 43. He acknowledged that Plaintiff's treating neurologist, Dr. Dulli described this as a headache disorder. R. 47. Dr. McKenna's opinion however, was that this was not a headache but a "stress phenomenon." *Id.* He stated that Plaintiff's description of her headache is most atypical in that she feels a lot of pressure in her head as if it is pushing out her eyes and she feels like her brains are coming out of her ears. R. 43. "[W]hen the pressure sensation gets more intense, she actually kind of passes out and has one of her episodes." *Id.* In addition, he stated that her neurologist, Dr. Dulli has tried her on several medicines that appear to have had no effect on her "so that tends to corroborate the fact that it is not an actual migraine headache, but it is actually the kind of panic attack, stress type of pressure sensation related to a psychogenic phenomenon." R. 43-44. Dr. McKenna testified that because her headache and seizure like spells all stemmed from stress he would give her a medium RFC. R. 49.

This is in stark contrast to the RFC prepared by Plaintiff's treating neurologist Dr. Dulli. *See* R. 732-33. Dr. Dulli opined that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently. R. 732. She could only rarely lift 15 or more pounds. *Id.* She could walk one block without resting but had problems with balance. *Id.* She could sit no more than four hours during a work day, could stand about one hour and would require unscheduled breaks during an 8-hour work day. *Id.* He further opined that claimant would be off task at least 25 percent of the workday and absent greater than five days a month. R. 733. These limitations are significant because when these limitations were given to the testifying vocational expert, she testified that with those restrictions, there were no jobs that Plaintiff could do. R. 73. However, when given a medium RFC as well as the other limitations identified by the ALJ in Step 4 of her analysis, the vocational expert identified three job categories that Plaintiff could perform. R. 70-73.

The ALJ determined that Dr. McKenna's opinion was entitled to "great weight" and Dr. Dulli's opinions were entitled to "little to no weight." R. 27, 29. Based on Dr. McKenna's opinions, as factored into the vocational expert's analysis, the ALJ found that Plaintiff was not disabled.

Plaintiff argues that the ALJ's decision should be remanded for two reasons: First, the ALJ failed to properly apply the treating physician rule. Second, the ALJ failed to develop the record by seeking input from a psychologist as to what limitations were necessary for a headache and seizure disorder with a psychological component.

### III. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are

conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19-20 (N.D. Ill. Oct. 29, 2014).

## IV. Treating Physician Rule[1]

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is "not inconsistent with the other substantial evidence in the case." 20 CFR 404.1527(c); *see Scott v. Astrue*, 647

---

[1] The Social Security Administration recently modified the treating-physician rule to eliminate the "controlling weight" instruction. *See* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). However, the new regulations apply only to disability applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply.") (emphasis added) *with* 20 C.F.R. § 404.1520c ("For claims filed (see § 404.614) on or after March 27, 2017, the rules in this section apply."). Plaintiff's application in this case was filed in 2014. Accordingly, the ALJ was required to apply the treating physician rule when deciding Plaintiff's application.

F.3d 734, 739 (7th Cir. 2011). A treating physician has "greater familiarity with the claimant's condition and circumstances," and therefore an ALJ may only discount a treating physician's opinions based on good reasons "supported by substantial evidence in the record." *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Here, the ALJ found that Dr. Dulli's opinions were not entitled to controlling weight. R. 29. The ALJ recognized the standard set by 20 CFR 404.1527(c) but in discussing this standard the ALJ cherry picked evidence from the record, failed to explain how that evidence was relevant to her determination and mischaracterized other evidence in the record. In support of her finding that the opinion was not supported by clinical and laboratory diagnostic techniques the ALJ noted "Dr. Dulli's supporting documentation indicates normal clinical and laboratory test results such as the EEGs of record. Dr. Dulli's referred to the claimants action during an in office 'episode' as minimal." R. 29. The ALJ failed to explain how a normal EEG and "minimal" action during an in office "episode" is inconsistent with Dr. Dulli's opinions as to Plaintiff's restrictions. Dr. Dulli diagnosed Plaintiff with new persistent daily headaches associated with paroxysmal nonepileptic events. R 512. The ALJ does not explain how a normal EEG tends to undermine that diagnosis or the restrictions Dr. Dulli sets forth. Paroxysmal non-epileptic events or episodes resemble epileptic seizures but are not attributable to epilepsy or abnormal electric activity in the brain. *Boiles v. Barnhart*, 395 F.3d 421, 422 (7th Cir. 2005) (citing Ronald P. Lesser, *Treatment and Outcome of Psychogenic Nonepileptic Seizures*, Epilepsy Currents, Nov. 2003, at 198). As such a normal EEG would support Dr. Dulli's diagnosis not militate against it.

Moreover, the ALJ does not address other abnormal laboratory results that could be interpreted as supportive of Dr. Dulli's restrictions. Beginning in March of 2013, Plaintiff was

noted to have a high white blood count, high neutrophils, lymphocytes and monocytes. These abnormal laboratory results continued into 2014 and in July of 2014 she was referred to a hematologist who discussed her abnormal lab results in the context of her chronic headaches and paroxysmal nonepileptic events. He diagnosed a reactive leukocytosis due to the stress of her current illness. R 548. These abnormal laboratory results could be interpreted as supporting Dr. Dulli's restrictions (i.e. the stress of her non-epileptic spells, headache and mental health issues was severe enough that it was causing an abnormal white blood count and other abnormal laboratory results). However, the ALJ merely disregarded them, omitting to comment one way or the other on whether those abnormal tests supported Dr. Dulli's restrictions. The ALJ may not cherry pick those facts that support her conclusion and omit those that do not. *See, e.g. Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Kimberly L. W. v. Berryhill*, No. 17 C 50281, 2019 U.S. Dist. LEXIS 13791, at *16-17 (N.D. Ill. Jan. 29, 2019).

Regarding the consistency element of step one, the ALJ further stated that "Dr. Dulli's supporting documentation does not address any lifting, sitting or standing restrictions. In fact, the claimant endorsed exercising at a gym, starting a walking program and indicated recently that she exercised by leading a cheerleading and dance program." R. 29. The problem with this analysis is the ALJ mischaracterized the evidence found in the record and left out several important findings that are consistent with the limitations Dr. Dulli recommended.

For example, contrary to the ALJ's statement, the record does not show that claimant "exercised at a gym." The records indicate that on April 17, 2014 Plaintiff "states she has been using a Total Gym device which belongs to her parents – using it for 20 min. sessions, up to 2 days/week." R. 441. The ALJ does not address how Plaintiff's exercising on a total gym apparatus 20 minutes a day up to 2 days a week is inconsistent with Dr. Dulli's stated

restrictions. This is error. *Clifford v. Apfel*, 227 F.3d 863, 871 ("the ALJ did not provide any explanation for his belief that [Plaintiff's] activities are inconsistent with [the treating physician's] opinion and [the] failure to do so constitutes error."). Moreover, there are several records that indicate that later in 2015 and 2016 Plaintiff could not exercise due to fatigue. R. 750, 756, 761, 765, 773.

Similarly, the ALJ states that Dr. Dulli's restrictions are inconsistent with Plaintiff's walking program. The records show that Dr. Dulli's office placed Plaintiff on a walking program that encouraged her to try to walk 20 to 30 minutes most days. R.798. There are notations in the record that indicate that Plaintiff was not able to achieve this goal. For example, she often complained that she could not exercise due to fatigue. She complained that she would lose her balance sometimes and she would get cramps and muscle pain when walking. R. 774. She explained that she is exercising with a total gym and is "trying to walk." She estimates exercising 20 to 30 minutes 2-3 days per week. She states exercising is problematic during severe headaches 2-3 days per week. R. 533. Even if it is assumed that she was able to walk 20 to 30 minutes most days the ALJ does not explain how that is inconsistent with Dr. Dulli's restrictions.

The ALJ also found that Dr. Dulli's restrictions were inconsistent with Plaintiff's statement in August of 2015 that she is exercising by coaching cheerleading and dance. This statement indicates that at least as of August of 2015, Plaintiff's exercise did not include use of the total gym device or walking but rather consisted of coaching. There is a single reference to this in the records, it is never repeated in the records again and it is never elaborated upon. The ALJ does not discuss how this coaching is inconsistent with Dr. Dulli's restrictions. In addition, references in the medical records after August of 2015 indicate that Plaintiff cannot exercise

because of her fatigue. Because the ALJ cherry picked those facts that she claims negated Dr. Dulli's opinions without explanation, while ignoring factors that arguably supported his findings, the ALJ committed error at stage one of the treating physician analysis.

The ALJ further erred in her analysis at step two. If the ALJ does not give the treating physician opinion controlling weight, the ALJ cannot simply disregard it, but must proceed to the second step and determine what specific weight it should be given. To accomplish this, the ALJ must look to a list of factors to determine what weight to give an opinion. *Moss v. Astrue*, 555 F.F.3d 556, 562 (7th Cir. 2009). The list of factors includes the following: examining relationship, treatment relationship (length and nature of treatment relationship and frequency of examination, along with nature and extent of the treatment relationship), supportability, consistency, specialization, and other factors. 20 CFR 404.1527(c).

Here the ALJ stated that she gave "little or no weight to Dr. Dulli's opinion." R. 29. However, the ALJ failed to explicitly analyze at least three of the factors set forth above. This factor alone is a ground for remand. *See, e.g. Kimberly L. W. v. Berryhill*, No. 17 C 50281, 2019 U.S. Dist. LEXIS 13791, at *16-17 (N.D. Ill. Jan. 29, 2019); *Wallace v. Colvin*, 193 F. Supp. 3d 939, 947 (N.D. Ill. 2016); *Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug 4, 2015). There is no mention of the number of times Plaintiff saw Dr. Dulli or the length or character of these visits. Dr. Dulli's office treated Plaintiff for her headaches and non-epileptic events approximately every 3-4 months starting in 2014 and continuing through the hearing date. These visits lasted from 25 minutes to 60 minutes.

The ALJ also failed to discuss the specialization factor. Dr Dulli is a neurologist with a sub specialization in headaches. Dr. Dulli diagnosed Plaintiff with persistent daily headaches associated with paroxysmal nonepileptic events. He recommended restrictions. These diagnoses

are within his specialization. The ALJ should generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty. 404.15327(c)(5). These factors may weigh in favor of giving greater weight to Dr. Dulli's opinions and the ALJ's failure to address them was error.

Of note the ALJ did discuss Dr. McKenna's specialization albeit she does not explain how someone who is board certified in internal medicine with a subspecialty in pulmonary medicine is more qualified to opine on restrictions related to headache and paroxysmal nonepileptic events than is a neurologist with a subspecialty in headache.[2] Nonetheless, while the ALJ did discuss Dr. McKenna's specialization, she did not discuss the treating physician's specialization which is required by the regulations.

With respect to the remaining factors at step two, the ALJ did discuss supportability and consistency in step one of the analysis. However as set forth above, that discussion mischaracterized entries in the record and omitted many entries in the record that supported Dr. Dulli's opinions. This is not only an error at step one it is an error at step two.

The ALJ's error was compounded by the fact that she accorded "great weight" to Dr. McKenna's opinion as to Plaintiff's functional capacity without providing a logical bridge between the evidence and Dr. McKenna's opinion. Dr. McKenna testified that Plaintiff's psychogenic episodes and headaches were in his opinion caused by stress "and therefore she should be limited to a medium residual functional capacity." R. 27. Dr. McKenna did not explain why someone with stress induced psychogenic episodes and stress induced headache of

---

[2] The ALJ also relied on the fact that Dr. McKenna was "familiar with the regulations under which disability benefits are determined." R. 27. It is true that Dr. McKenna testified that he has reviewed social security cases for 26 years. R. 46. However, it is unclear how this was relevant when determining Plaintiff's restrictions in this case. *See, e.g., Loftis v. Berryhill*, No. 15 C 10453, 2017 WL 2311214, at *4 (N.D. Ill. May 26, 2017) ("An examining physician does not need to know anything about disability law in order to determine the degree to which a patient can use her arms to push and pull.").

the level described in the records automatically translates to a medium functional capacity.³ Dr. McKenna did not discuss, or address Plaintiff's statements as referenced in the treating records that her headaches reach a 10/10 scale level of pain one or two times a month, can cause her to be bed ridden, require her to be in a quiet, dimly lit room and can last one to three days. Such time away from work would be inconsistent with a medium residual function capacity. Without elaboration by Dr. Mckenna or explanation by the ALJ as to why she gave great weight to Dr. McKenna's assignment of a medium RFC, there is no logical bridge between the evidence and the ALJ's conclusions. Given the focus at the hearing on Plaintiff's stress related impairments and other psychiatric issues, on remand the ALJ should call a medical expert who can opine about Plaintiff's various physical and mental impairments. *See* HALLEX 1-2-5-34A.1.

In light of the above, the Court finds that a remand is warranted. Because this case will be remanded, and because the issue of the treating physician's opinion is fundamental, the Court finds it unnecessary to address the remaining arguments.

## V. Conclusion

For the reasons listed in this opinion, Plaintiff's motion for summary judgment [10] is granted, the Commissioner's motion [15] is denied. The decision of the Commissioner is reversed, and the case is remanded for further consideration.

Date: May 23, 2019         By:  *Lisa A. J.*
                                Lisa A. Jensen
                                United States Magistrate Judge

---

³ Even Dr. McKenna seemed equivocal about his RFC determination. *See* R. 49 ("[L]ooking at the situation that most of her problems are stress induced. It probably is prudent to limit the loads at least to medium, and I guess, if somebody -- you know, a female was lifting 50 pounds, occasionally, it could be considered stressful enough. So I guess, one could talk one's self into -- to a light RFC, but readily, I think one could support a medium RFC.").